To our next case, United States v. Laurent. Good morning, Your Honors, may it please the Court. I represent Mr. Laurent. I'd like to discuss with the Court first the Bruton issue he raises. And in this, Mr. Merritt gave a number of statements that incriminated Mr. Laurent in the robbery and murder of James. Mr. Laurent was not indicted or charged for that. What's essentially being raised to the Court now is the claim that the redaction that was made was not sufficient to eliminate, and I'll use the word as this Court used in jazz, any signals that what redaction, these neutral indicators of someone were actually substitutions for an actual name. And the basis of this argument is that looking at the confession, Merritt confession, as a whole, certain factors. One is the confession's two pages long and the substitution of the words the other guy 22 times, so we submit unnatural. The second is that James, the victim here, was specifically identified as his actual name, James, by Merritt there. So any juror seeing this confession, seeing that Merritt used an actual name. And the third is that the confession itself in a number of ways shows and indicates and signals that there was a close relationship between Merritt and the other guy. And therefore, it was unnatural and awkward. Why is it that Merritt would have continually used this other guy rather than the actual name? You want to rat out the other guy. Well, but the confession itself was ratting out the other guy. It's saying, hey, it wasn't me. It was the other guy. But that doesn't necessarily mean that he's telling the police who the other guy is. I would submit that if he's going down that road to blame someone else, he's going to have to identify by name who that person is. And in this, there are many ways in which this close relationship was indicated, but I'll name three. Does it matter at all that Mr. Laurent was not actually charged with this particular crime that this adequately or inadequately brutalized statement related to? I realize it's part of the overall conspiracy. Is that the basic answer? Yeah. Judge Lynch, I think it does. And I think also the analysis here with a Bruton violation is, was it harmless? And I think when we talk about was this harmless, I will give that argument. Of course, there's a great deal of evidence against Mr. Laurent in this case. So there is, from the government's standpoint, well, where's the harm? I thought your argument was just because he was charged with other murders, the jury must have concluded this one, too. Yes. Is that your argument? Is there any evidence of that, though, that there's that crossover? Yes. I would say, well, the jury verdict here, as far as Merritt is concerned, where Merritt was indicted for the murders of, the murder and robbery of James, and then was acquitted on those counts. Now, what was it that Merritt's counsel argued to this jury was, as close as you can get, it was Laurent. I mean, and there were problems with what this counsel did on that. But then also, now, my argument with Bruton has been very careful because I have not been relying on other evidence at trial which clearly identified that this, in fact, was Laurent. The cell site information, the recorded, the telephone call information, surveillance video, that sort of thing. So once you, when you step, I submit that once you step into was it harmless or not, you can start to look at that sort of thing and say, yes, this was something that harmed him. And particularly because, you know, Mr. Laurent was charged with, you know, other murders or another murder or attempted murder. And therefore, yes, you know, it doesn't take that much then to create harm in those serious trials. Aren't there precedents that say that if the, that the fact that there is trial evidence that, that provides this linkage doesn't, isn't, isn't to be considered in the Bruton? Yes. Yes. And as I said, I was trying to be very careful in not bringing that sort of evidence in and making this argument and making the argument based on the statement itself, that there was enough in the statement itself that signaled to, and I'll use Gray's terms, a, a sophisticated juror that, that juror might pursue the inference that it was a co-defendant at trial. And in fact, an indicted co-defendant who was accused of murder in other contexts. Thank you. Thank you. Uh, Mr. Rosenthal for Mr. Merritt. Good morning, Your Honors, I'm Robert Rosenthal for Mr. Merritt. Um, we are not arguing here, um, credibility of the cooperating witness or weight of the evidence. Um, the point is there's no evidence that Mr. Merritt committed crimes that were gang related crimes. The government showed us very clearly what types of crimes this gang committed and they were complicated, highly choreographed crimes. The cell phones when the gang stole them were, um, many people involved, um, all each playing a role. The money was then collected and, and the participants were paid for it. Um, Merritt mugged three people and took their cell phones. Um, there were three people who were alone and vulnerable and sold the phones and kept the money. Um, those are very different crimes. Um, the jewelry store robberies as well just are another example of how this, this gang conducted their, their crimes. Um, and the same is, and, and, and so that's, that's one example of, of Merritt's crimes being street crimes, not the gang related crimes. Um, and with Dasta James, that crime also does not bear the characteristics of the types of violent crime. But, but, but Bell testified that these kinds of robberies were, were good for your membership in the gang though, right? There was evidence tying them to the gang. Bell testified that you had to do work for the gang. You had to, uh, bring in money and you had to do crimes for the gang, but there's no evidence that these crimes were bringing in money for the gang. These guys stole cell phones, sold them and kept the money, which is different than those working with the gangs. If you're one of the people on the jewelry store robbery that carried the sledgehammer did something, you're working for the gang. These seem to be separate crimes, um, that the gang may not even have known of. The other characteristic that we see of some of the violent crimes in this case is the bragging, um, the, the bragging, the killed someone because they're crips, whatever the reason was, um, Dasta James was not a crip. Um, nobody bragged about that crime. In fact, um, uh, they dropped out of sight after that crime. Um, again, it just doesn't bear the, the, uh, characteristics of this gang's crimes. The oath, the oath is, is, um, you know, in more than 40 witnesses, nobody put the word crips in Merritt's mouth. We don't know what the oath was because Bell testified that he took an oath. Well, Merritt did go along with the, uh, the group that was, uh, searching for, uh, the been murdered by someone named Dulles, but he was part of that expedition, but even by Bell's that's the, that's the, one of the strongest, uh, pieces of, of the whole, they were trying to kill crips conspiracy, right? Well, even by Bell's testimony though, that day, when they went out with Merritt, violence was the object. They were looking for the specific guy that mugged the other guy. Then they were looking for anyone from the Vandevere houses. Um, anyone who looked like they were from the Vandevere houses. Crips was in the thing, but, but Bell didn't even know anybody had a gun. He testified he didn't see a gun. So murder crips, the cooperating witness didn't know that they had a gun. So how was that a conspiracy to murder? It may have been to beat them up. They were not out for good stuff, but as far as this specific thing that he was charged with, I, I, I don't think the evidence is there. They did go out. Um, but, but I think it was a different, I think it was a different crime. As far as the oath, if taking the oath of the gang is enough to sign on to murder. And clearly when Bell took the oath, that's what he meant. But if we're going to, if we're going to impute Bell's intention to Merritt, then what we're saying is just joining a gang is a crime. Joining a gang is enough to be a racketeering act because the oath is all that is, is joining the gang. So you can credit Bell. I mean, yeah. If, if, if you, by joining the gang, you mean, Hey, I get to wear the colors and be a member. That's one thing, but if joining the gang means we sit around a table and say, well, what is this gang? Uh, well, the story of this gang oath or no oath, blood on Holy cards or no blood on Holy cards. If everybody sits around a table and says, well, the purpose of this gang is to murder grips, uh, joining that gang, why isn't joining that gang by definition, a conspiracy to, uh, join a racketeering enterprise? Well, I, I suppose it could be. I mean, but that makes joining a gang. What, what do these gangs do? And if you join a gang, knowing that its purpose is to murder people of a particular rival faction, uh, I'm not sure why joining that gang isn't a crime. I mean, practically that would be all of these gangs first, just as a practical, maybe they were all, I mean, these are not rotary clubs, right. But, but, um, if we don't look at the, there are so many reasons why somebody living in Ebbetsfield houses might join a gang, it might be for personal protection and you have to take, yes, that's what these guys are doing. Bell said, I would be willing to do that, but we have no evidence that Merritt said he would be willing to do that. And, and I, I think it's, it's important at this point to, to, are we just going to impute what the cooperating witness believes or says he believes to, to everyone in the gang? The jury does. And, and my argument is that, that, that notion, Bell didn't say Merritt thought this, he said, I thought this and that that is insufficient. Thank you. Yep. Uh, Miss, uh, Ma, Ms. Marr, am I saying your name correctly? Marr? Okay. Thank you. Good afternoon. Lower that if you want, if that would be more convenient. I, I, uh, I represent, uh, Yasser Ashburn. Um, Mr. Ashburn was sentenced to an aggregate sentence of multiple consecutive life sentences plus 120 months. And I'd like to focus my remarks on, um, point one, um, in my brief that this court should reverse Mr. Ashburn's convictions because the evidence against him at trial was legally insufficient to show that he committed either of the two predicate acts underlying his RICO convictions. Unlike his co-defendants, there were only two predicate acts here that, um, were alleged that Mr. Ashburn, um, was, was involved with. The first one, um, had to do with the conspiracy to murder the Crips. And, uh, the only evidence that the government introduced was the testimony of Kevin Bell. And what's interesting about Bell's testimony is he claims that he was inducted into six tray, uh, folk on April 20th, 2008, but he admitted that at that time, six tray folk and eight tray Crips were allies. So there was no rivalry at the time that, um, Bell was inducted. The testimony with respect to Mr. Ashburn's presence was limited to that night. There was no further testimony by Bell that Mr. Ashburn was physically present or involved in any other, um, of the, of the gang's activities. So at the time of April 20th, 2008, there was no, um, there was no rivalry with the eight Crips gang. That didn't start until four months later in August of 2008. And that occurred as the court had noted, when somebody from the six train named Dulls was mugged by a, um, who he believed was a Crip. And based on Bell's testimony, he names all the people that went looking for Crips afterwards. Mr. Ashburn's name is not among them. He had a leadership role in the gang. I think that's undisputed, right? Well, I mean, we would dispute that he had a leadership role in the gang. At least there was evidence presented to the jury that he was one of the three leaders of the gang. The evidence came from Kevin Bell. And as I indicated in, in my brief, I mean, Bell was very close with D Block, who was also one of the leaders of the gang. And there was a lot, um, that was done to, um, cover up for D Block in terms of, you know, discussing a fight that allegedly happened where D Block was the victor yet Bell claimed he didn't lose any respect for Ashburn. There was a testimony that a few months after, um, Mr. Robinson had been shot that Bell disposed of a gun in a river at D Block's order. There was testimony that he approved the murder of a member of the Bloods, right? That was the only testimony about Mr. Um, Ashburn and approving a gang murder was, had to do once with the Bloods, but it wasn't the Crips and he was charged with murder or conspiracy to murder Crips. But is, can you draw an inference though, that he approved the murder of a rival gang, the Bloods before they had the big conflict with the Crips, that he still was exercising his authority as one of the three leaders of the gang? I don't think so judge, with all due respect, because at the time, um, at the time that, um, the attack on, on the Crips first happened, which was August of 2008, Mr. Ashburn hadn't been active with the gang since four months earlier. There was no testimony was active and he was indicted for conspiracy to murder the Crips specifically not to murder the Bloods. That would not be a fair inference to draw. It wasn't what he was charged with. It wasn't what the government was required to prove at trial. And it's not what the jury, um, heard. So that's another question for you. Not to my recollection, but I would have to go back and check the, the rule 29 and rule 33 motion, I don't recall specifically. Um, I mean, likewise, there was, the evidence was also legally insufficient to show that he had intentionally killed, uh, Kirky, um, Courtney Robinson. I mean, you know, there was very conflictive testimony between Thompson and, uh, Kevin Bell about what happened, but neither one of them witnessed the Robinsons that he saw him walking down the hall with a gun in his pocket toward where the shooting took place. And it just happened almost immediately after he didn't see it, but he heard the round go off, right? Bell said that he saw, um, Ashburn walking calmly down the hall. There was no mention of a gun with his hand inside a hoodie. And he thought he saw the gun through, um, the sleeve of his hoodie, but evidence of, uh, he was in the proximity of a murder with a gun minus any evidence of any motive that could be directed specifically at this victim minus any evidence that would exclude in the violent atmosphere of this particular housing project with many gangs in play that would exclude anyone else from that occasion. Well, if you credit Coretta Thompson's testimony and I, and, and I would say she was the more credible witness. This was her apartment. She had a party there that night. She stated she was angry that her boyfriend's nephew was there because he was a gang member. The fact that Bell is testifying, there was an induction meeting in a bedroom in Thompson's house that she was totally unaware of. I mean, they, they both testified that there was a fight that spilled out into the hallway, but then Bell suddenly, even though he just got inducted into the gang and he's testifying that acts of violence elevate your position, he decides to disengage and calmly walk down the hallway and he sees, um, allegedly Mr. Ashburn walking towards him. I don't think it's a fair inference to say that any, that because of the nature of the, I thought I was trying to help you, but what I was suggesting was, is it not the case that the only evidence against Mr. Ashburn is that he is in the vicinity where a murder takes place and he has a gun? Yes, that is correct. And there's no fact that, I mean, I, I don't know, with all due respect that you're going to make much headway, at least with me in denying that there is evidence that Ashburn was in the vicinity with a gun. The question is, is that enough to convict someone beyond a reasonable doubt of having shot somebody? And I would argue it isn't because this is a New York penal law, um, offense and for 125.25 second degree murder, you have to have proof that, that Ashburn had the intent to kill Robinson and you have to have proof that he caused Robinson's death. If he was the shooter, if he was the shooter, it could be inferred that he had the intent to kill from the nature of the shooting, right? There's medical testimony that, uh, there are powder burns on Mr. Robinson's back to, which would lead to the inference that the gun was up against him when it was, uh, fired at a vital organ. The problem is if he is not the shooter, then first of all, did he cause the death or if there's some argument that just by being there with a gun, he was aiding and abetting, is that enough to infer that he shared the intent of the assault in some vaguer way? I always submit that it wasn't. There was no statements that were made by him. Kirky Robinson wasn't even a gang member. I mean, this was a fight that got out of control at a party that people were drinking and smoking pot for five hours before. Is there any evidence that in this fight, there were two distinct sides and that Robinson was on the other side from someone that Ashburn knew was friendly with, was in a gang with? No. What about what Cooge said? Cooge implied that they shot the wrong person. It's the wrong somebody we shot. That, but he, but what, what you were asking me judges, is there evidence Robin that Ashburn knew either one of these people, one person was Omar, who was, um, Thompson's boyfriend's nephew who was in a gang, but it wasn't the sixth tray gang and the other person was Dewan who was, um, friends with the sixth tray gang. So let's go back to the question. Judge Roney asked this, uh, Cooge. Um, I forget what his government name is. Uh, if we even know, uh, said we shot the wrong guy. Uh, what is there a way that the jury could infer that the, we referred to a group that encompassed Mr. Ashburn. They could infer that, but they could also infer that whoever got shot in the hallway was somebody who randomly got shot because there was so much tussle and bustle and bottles banging over people's heads. And there was a lot of people in the hallway, according to Thompson. So the fact that he shot the wrong guy doesn't necessarily mean that it was a gang related incident. In fact, this was a birthday party that Ms. Thompson had for her niece in the apartment. She specifically said she didn't want her boyfriend's nephew there because she didn't want gang related people there. And the fight that occurred had nothing to do with, with a gang. It was drunk stoned people in her apartment for five hours. They get in a fight, they're throwing food at each other. It escalates. It spills out into the hall. She actually kicks them out of her apartment into the hallway. They're in the hallway. And at some point, um, Mr, um, Kirky goes out to protect his nephew, according to Robinson and winds up getting shot according to Thompson and winds up getting shot. Thank you. I know you have some time for rebuttal. We'll invite you back at that time. Uh, Ms. Lee. Good morning, Your Honors. May it please the court. My name is Maggie Lee and I represent the United States. And I was also one of the attorneys at the trial in the instant case. Um, unless the court would like me to begin elsewhere, I'll, I'll start where, where we just left off with the murder of Courtney Robinson. And I think that there are a couple of factual issues that I'd like to address. And also keeping in mind that, that appellate counsel was arguing two different inferences, but obviously in the position we're now in, we draw the inferences in favor of the government and whether or not with those inferences, it could be supported. Can you summarize what is the totality of the evidence from which it could be inferred that Ashburn shot, if that is the theory that Ashburn shot Robinson? Yes, of course. And it certainly is the theory. And I think stepping back to, in terms of the evidence and a question that you raised about whether or not there were two sides, there were two sides in this fight, and it was not an explicit gang separate sides, but there were two sides. And Omar, um, got into a fight with Dewan, who was the boyfriend of the niece of Ms. Thompson. Dewan at that time was not a member of Six Tray, but soon after did become a member of the Six Tray and the members were close and loyal to him. After Omar attacked Dewan, members of Six Tray then started to attack Omar. And it was the gang as a whole, multiple members, which was, regardless of whether or not Ms. Thompson knew the affiliation, she and Kevin Bell both testified that there were multiple individuals that the evidence established were Six Tray members, started attacking Omar. Courtney Robinson then came to Omar's defense, taking Omar's side, and the gang then started to attack Ms. Thompson. Ms. Thompson testified that she saw Ashburn, along with another, a couple of other members of the, of the fight, leave the fight and run down the hallway towards a location that the evidence established was an incinerator where the gang kept its weapons. Ashburn was a part of that group that left the fight to go in to a location where guns were kept. Then Kevin Bell sees him running back with the gun in his hand. And shortly thereafter, he hears the gun go off. The evidence, as, as the court already talked about, said that it was a close range shot to Courtney Robinson that killed him. Who are the Six Tray members who are fighting against Omar and Robinson? Uh, Kevin Bell was obviously there. Uh, Yasser- Was there. Who's, who's actually in a fight with- In the fight, I'm sorry, in the fight, Kevin Bell, Yasser Ashburn, um, Cooge was involved, uh, well, I'm sorry, was actually in the fight. Let me just refer to a couple of the other names that were, that were actually in the fight. Devon Rodney was also involved. He was another leader in the gang. And, and so I think all of it establishes that there were two sides, but also it's clear that a jury could infer- There is evidence that Six Tray members, the ones you named, are engaged in fighting a group that includes Robinson. Uh, yes. I mean, as, as Cooge made clear, they believed that many of them believed that they were still fighting Omar. Um, and they did not necessarily intend Robinson to be the one that was killed, but they were engaged in that fight. And I also think that it's important to understand that there's another element- That's what supplies a motive element, uh, with respect to, I mean, look, it seems to me that in like regular courts where they try regular murders, you don't normally have a case that is predicated on there's a guy with a gun somewhere in the vicinity of someone who's shot and that's sufficient to charge him with murder, right? There's got to be something else. Then he's the only guy that Bell saw with a gun that night. Well, I think that it's not just a guy with a gun in the general vicinity. It is somebody who was engaged in the fight- That's the point. Excuse me. That's what I'm asking you. That's why this is so important to nail down. It, it would not be enough, would it? Just to say he was somewhere in the hallway with a gun and then somebody gets shot. Is, is it, is that enough to find beyond a reasonable doubt that he is the shooter? At least in a world where there are guns all around. Right. But I think in this case, it's important to, to pay attention to specific testimony of Kevin Bell. And it was not that, oh, I know that Ashburn was in the area with a gun. It was, I started going down the hallway away from the fight. Ashburn is running towards the fight with the gun. He goes to get a gun and then comes back. Exactly. And the, in the testimony, not- I'm sorry, but had he testified that he was in the fight before he went down the hall to where the guns were? I believe that Ms. Thompson had testified. There was testimony that he was involved in the fight. He was in the fight. Yes.  Ms. Thompson saw him leave the fight, go down the hallway. Kevin Bell testified that the direction that he was going is where one of the six tray gun stashes was kept. And he also testified that as he left the fight, Ashburn was returning, running, going back down the hallway towards where the fight was with a gun in his hand. And just- Is there anyone else that we need to worry about in reading testimony? The only people who are witnesses who were there that night are Bell and Thompson? Yeah. Yes. As to the actual witnesses of the Courtney Robinson events. And I do think as to your question about motive, there's an additional motive that we discussed- That's a motive for killing anybody, right? You're saying Ashburn was, had recently been in a fight and so now he's got to kill somebody. That's a lot different than an argument that he has a motive to have something against Robinson or Omar or anybody else who's in the room that night. Well, and I, I think though that the point being, the question is, why would he have done this and is this related to the enterprise? The question is, how do we know that he did it? And one way we know that he did it is if he has some reason to do it. And you're saying it's enough of a reason to infer that he is the shooter, that he's got a reason to shoot just about anybody in the world that night. No, what I'm saying is when you look at the actual facts that were elicited in the testimony, that he engaged in the fight, that he left the fight to go to an area where the guns were stashed and that he returned with a gun and shortly thereafter, that when you couple that with the fact that shortly, two weeks before, he lost a fight and that there was a motive for him to take a fight in front of the gang members to the next level, to reassert his authority. When you look at that fact, coupled with the clear testimony that is, that gives you an inference that he was the one who actually pulled the trigger, I think that that is another reason that you can understand why a jury found that he had intended to and did in fact kill Courtney Robinson. I take it you're saying that the fact that he was in the fight before he went to get the gun supplies, supplies at least part of the motive for the killing, that he was fighting this person and he went to get a gun, came back and the person got killed with a gun as he was coming back. The, the fact that he was fighting with him is a, is a motive to kill. Is that, is that your argument? Well, I think that the fact that the gang itself was fighting with him was enough to, to have that motive because of the way, but because he was fighting and because he left to get, when he leaves, having been involved in the fight and then coming back with the gun, I think the inference is clear from what the jury drew, that he was in this fight, he was with his, his fellow gang members, he decided to go and get a gun and take it to the next level and he did in fact kill him. And that's a fair inference from all of the testimony that was elicited at trial. Could you tell us what evidence there was of his conspiring to, to kill Cripps? Of course. That's, that's the first racketeering act, right? Yes. Um, and I think as at the outset, I just sort of make clear that the testimony at trial was not limited to, to one month and the events in Courtney Robinson with respect to his involvement in Six Tray. There was, there was additional evidence of his tattoos. There was evidence of his jail calls that was admitted that showed that even up until the time when he was in custody and arrested, he was continuing to keep tabs and involvement in his gang. And so it's simply not true that there wasn't any evidence of his involvement in the gang after April, 2008. I do think that what your honor brought up earlier is an important key in understanding his involvement and his culpability on racketeering act one, and that is his leadership role in the gang. The evidence very clearly established at trial that the way the hierarchy in this specific gang worked, he had to be consulted and he had to have approval for for the murders and the actions that the gang took. The evidence and trial also established that a rivalry with the Crips started in August, 2008, and it continued at a minimum through the summer of 2010. And so a jury could infer that from the fact that there was a rivalry for over two years that involved a number of killings, that that could not have occurred without the approval of the big homie and the leader of the gang. And we know that he understood and agreed to and asserted his authority because with the other rivalry, with the Bloods, he specifically directed the murder of a rival. And so a jury looking at all of this evidence about how the hierarchy works, the approvals that you have to get, the very real existence of this rivalry with the Crips, the number of individuals that were killed as a result of the guilty of a conspiracy to murder Crips. I know that I just reread, because it's rather short, all the portions of your brief, both in the fact statement and in the statement, the argument on the sufficiency of the evidence against Ashburn, that there is in your summary of the evidence, no statement that Ashburn played a role in the fight before he is seen heading towards the incinerator. That doesn't mean it's not there. But I was hoping to find it that I had overlooked it because then it would give me a page reference or something in the transcript to refer to, but there is no statement in the portion of your brief, summarizing the facts that says Ashburn punched somebody, hit somebody. There was a group kicking and stomping. Omar doesn't say Ashburn was in the group. Then in the rather brief argument on the sufficiency of the evidence, there's also no reference, I guess the closest it comes is a passage on page 51 that says in the midst of a fight, Ashburn left the Malay with other gang members, but that just shows him heading in the opposite direction from the fight to get the gun. It does not, it says, and a fight was going on. It doesn't say that he participated in the fight. Now, again, he may, and you know, I guess I'll go back. There may be such evidence. I'll go back and read the testimony of Thompson and Bell, but it might help if there is such evidence, if you gave us a letter giving us a page reference so we could find it. Of course. And I do think that, you know, Thompson does testify that there was the fight going out outside of her apartment. Omar scrambled into the apartment and then she saw Ashburn, Dblock and Cooge and others run down the hallway away from it. Yeah, run down the hallway, right. I understand that. You see, I mean, I'm trying to figure out how much evidence there is that Ashburn is involved in this factional fight and what is described in the brief. And that's why I reread it again, because I was unpersuaded by it when I read it the first time, and maybe I overlooked something. What's there is there's a big general fight and various people are kicking and hitting each other. There's not a statement that says Omar is being attacked by people that anybody specifically listed as being members of the Six Trey gang. Now that's not saying it's not there. It may be in the, in the record somewhere, but I'd like to see where that is. If that is in fact a fact that you're asking us to rely on in concluding that the evidence is sufficient because this was, you know, it wasn't a Six Trey versus Crips fight, but it was a fight in which on one side there are members of the gang, and I understand that once there are members of the gang involved. In some way that says you have to go to the support of the gang members. That that's pretty good evidence coupled with the opportunity evidence that a jury can work with. But otherwise I'm still wondering, you know, if the most we've got is he's somewhere near the murder with a gun. He went, even with, he went and got a gun. Wait, I, I, I understand, but I, I do think that regardless of whether or not he was throwing punches, even that testimony that you just read and I went through, what it makes clear, because this is not some open big area, it's a hallway of an apartment building. He is at the location where members he has seen running away from a location where there is a fight in the hallway where members of his gang are fighting someone else, he is seen. That's the key. That's what I'm trying to get at. You keep saying that, but it isn't said in your brief. Do you understand what I'm saying? It's going to be very important to me whether there is actual evidence that members of his gang are fighting against somebody as opposed to there's just a general brawl. Understood. I'm more than happy to, to supply that, um, to the court. Sticking for a moment with the language that, uh, Judge Lynch was reading. I had read the words in the midst of a fight, Ashburn left the melee as implying that, that before he left the melee, he was in the melee in the midst of the fight. Now, was that intended? Did, was there, is there evidence to support, not just that he was seen going to a place where there were guns, but that he was seen, that he was seen previously being in the midst of a melee in a fight from which he left to go in the direction of the guns? Is there evidence of that? Yes. I believe that we, we put in testimony that we will provide the specific sites to the court to establish that he was there in the, in the melee with Courtney Robinson. Um, and I, I believe that we'll be able to provide that. I do think though, that regardless of whether or not he was throwing punches, regardless of whether or not he was involved in that fight at that moment, the fact that he went, got a gun, came back, and then shortly thereafter, someone was killed, there is clear evidence that he killed Courtney Robinson. Okay. Thank you. Uh, we have a few rebuttal arguments, uh, to hear. Mr. Bryan. All right. And Mr. Rosenthal, you're up next. Yeah. I just wanted to, uh, make clear we were discussing the oath. Um, even if you keep that, if you drop the cell phones and Dasta James, there aren't, uh, we need to have, we need to have two, right? And then there's, there would be Dasta James or the cell phones, but I understand well, your argument about why you think neither of those further. And just one, just one other point. And I don't, I don't often argue like, but in this, I think it's important that, um, we really do have to, for evidence to be sufficient, that we have evidence of merits intention, because in the world in which we live in this city, there are many reasons that people join these gangs, many reasons. And to, to impute one person's belief that he joined a gang to kill Crips to everyone is, is, is opening a door to this, just that just joining is the, is the crime regardless of the oath and with all of the cooperating witnesses, with all of the power of the government, if there was evidence that merit said, anything that I want to go after Crips, I'm joining to go after Crips, let's go after Crips, anything, we would have heard that. But with all of those cooperating witnesses, nothing was produced like that. And I just think that's an important thing to recognize, given the world in which we live, given what, what exists in public housing and Ebbets Field housing and public housing all over the city, all over the country, I think it's worth, um, I think it's just worth noting. Thank you. Ms. Varn? I'm sorry, Judge LaValle, did you have a question for him? I just, um, the, the, one second, the government spend all of its time on one single act and I, I wondered whether the government didn't have some argument, uh, to give, uh, uh, with respect to the arguments made by merit. I was actually wondering that too. Did you want some more time to address that? Go ahead then. So I, addressing just the two main arguments that merit made. I, um, first is to sort of, as to what was just left that, that we're essentially criminalizing, um, that it's dangerous what we're criminalizing. I think that what's important here is that the evidence established that this was not just agreement to hang out with people and wear different colors. It was an agreement that we were going to kill and take on other people's rivals. It was something that Mr. Merit understood. He'd been a member of the tray six group that was basically the babies, the baby six trays where you're trying to get legitimacy into it, but it's also something that, you know, that he clearly understood because he went that night to the Vanderveer housing projects. And I think the evidence established that, that it was a member of the Crips, that it attacked Dulles, that the Crips owned, that they had control of the Vanderveer housing projects the way Folk had control of Ebbets Field. And when they went there, there was an intent to commit acts of violence against the Crips. It was something that Merit had agreed to when he joined the gang. It was something he agreed to again, when he went that night and simply because he wasn't there when Dulles ultimately killed KO, it doesn't mean that there wasn't an agreement and there's no requirement. What about the cell phone robberies? So as to the cell phone robberies, I think Kevin Bell specifically testified that one of the ways that the gang made its money and the type of work that this specific gang did was robberies and drug deals. And it's a misrepresentation of the testimony and the evidence of the case to say that the gang was only involved in sophisticated robberies. Kevin Bell testified that when he first joined the gang, he himself did five cell phone robberies, including one cell phone robbery with Merit. And it was a common way that they would make money and they would build their reputation. They were also required to pay weekly dues to the gang. So even if the gang didn't specifically get a cut of every single robbery you committed, a portion of it would go because they had to pay weekly dues. And there were of the... I'm sorry, Bell said that he did a cell phone robbery with Merit? That is correct. And that's, that is referenced in our brief. I mean, that's, that's fairly significant, isn't it? In comparison to the idea that, because I think one of the arguments that was made either here or in the brief is that these robberies that are the predicate acts were done with somebody else who doesn't seem to be a gang member as far as we know. So unlike the more sophisticated cell phone robberies and the jewelry store robberies, and even the Dust to James matter, these are not, there's no other association with the gang and there's no evidence that any money from that, those robberies was shared with anyone in the gang. Right. But if there is one that Bell did, that also makes some difference. Yes. And that they did approximate, he did five robberies. He testified to remembering to do, doing one with Merit. And then as to the actual robberies that are the racketeering acts, the very first robbery Merit said he committed with the same person who shot Topes, which is the nickname for Dust to James. And so that first robbery we also know was committed with a member of Six Trey. Wait, with, with, um, uh, with Laurent? With Laurent. With Laurent. So that, so one of those two cell phone robberies that are predicate acts can actually be linked to another gang member. Is that right? That's correct. And then both of those robberies occurred. Uh, the first two robberies of, of, um, the cell phone ones were in a, almost the exact same area within two days, close to the Ebbets Field apartment buildings. Uh, one of them was an Ebbets Field resident. And so not only is this the type of thing that the gang would do, but doing something like that in public, in daylight with another individual, one of which times was a member of the gang, is another way to promote your reputation. Where the victim is someone who actually knows you. Exactly, exactly. Um, and so I think that for, for those reasons, we believe that there was sufficient evidence to show that the robberies, which were part of the bread and butter of what the gang did, the way they made money and how its members contributed were related to the, related to the enterprise. Thank you. Mr. Rosenthal, did you want to briefly respond to that? No. Okay. Uh, Ms. Maher then. I just wanted to just jump back to two points that the evidence does not support finding that the fight where Robinson was shot was a gang related fight. Um, Dewan may have become a gang later, later, but he wasn't gang member later, but he was not a gang member that night. And this is Ebbets Field apartments. Whether a gang member or not, everybody knows everybody. Um, um, Ms. Thompson knew everybody because they were friends with her daughter and her daughter wasn't in the gang. So the fact they knew each other and they were helping each other didn't mean they were doing so out of allegiance to a gang. Um, that particular night, um, Bell, um, he was friends with Dewan. He says he jumped in to help Dewan after the fight between Omar and Dewan broke out, but he Bell testified. He didn't even know who Omar was. Isn't that a fair inference that when, when gang members are cooperating with one another in a fight, I mean, you, you argue there's another inference they  to be not an unreasonable inference that they were, well, with all due respect, I would, I would agree with you except that here Dewan had not yet been a member of the gang. He, the tech, the evidence didn't shows he was not a gang member. And also according to Bell's testimony, he jumped in to help Dewan because he was his friend. That's what he said. And if he was looking to, um, help the gang, when he saw this tussle in the hallway, instead of getting up and walking away and going back to his fellow gang members, that's not what he said he did. He said he left and walked to the stairwell. And that's when he claimed he passed Mr. Ashburn walking towards him. He was leaving while the fight was continuing. Um, and again, Bell said he didn't even know who Omar was when he jumped in to help Dewan. So it's not like he knew Omar was a gang member and he was jumping in to help another gang member fight this guy. He didn't, Dewan wasn't a gang member at the time and Bell didn't even know that who Omar was, let alone he was a gang member. And I'll also just want to add that the evidence, as I recall, shows that Mr. Ashburn was not part of a fight that preceded the shooting of Kirky. Mr. Ashburn, according to, um, Ms. Thompson had left her apartment at seven o'clock after taking some food into the hallway. It was only after the fight broke out in her apartment spilled into the hallway that she pulled her nephew inside the apartment. And as she was doing it, she said she saw a group of eight people, including Cooge, Ashburn and D Block, three people that were in the gang, but five other people she didn't identify that were not necessarily gang members. And it would not be appropriate or fair to infer that they were, they were eight other people who lived in Ebbets field or didn't, who were involved with running down a hallway towards an incinerator and all running back. But the only people she identified in that group, as I recall, and looking through my notes was Cooge, Ashburn, Ashburn and Block. And there were five other people that were unidentified. Thank you. So why don't we talk about that letter, uh, Ms. Lee, uh, you're going to tell us what in the record, uh, will inform us about the circumstances leading up to the shooting that day, right? And, uh, you think you can get that into us, uh, within, uh, by next Wednesday, would that be enough time? And Ms. Maher, would you like to be able to have the opportunity to file a letter at the same time saying why there's no evidence or insufficient evidence of the circumstances leading up to the fight? Uh, of the gang relation, uh, to it. Okay. So, uh, by next Wednesday at 5 PM, that good, good for you too, right? Okay. Yeah. I think that's, uh, uh, uh, Judge Lynch was particularly interested in. Yeah. I think the government should include in the letter, um, any evidence of the presence of gang members in the, in the fight. Yep. Um, also was there a request for a supplemental brief by the government on the 924C issues here? We're awaiting guidance from the Department of Justice as to the position and the fact of DiMaia. And so we would ask for the opportunity to give supplemental briefing on the effects of DiMaia once we get that guidance. And how long do you think that'll be? Do you know? Unfortunately, we don't know, but, um, we'll certainly get this letter in for a week. Somebody can get on the horn to the Solicitor General's office and say that the panel is really putting some pressure on you to get some, uh, some answers here. That would help. Maybe that'll help you. So why don't we say this? Why don't you say the supplemental brief is due at the same time next Wednesday, but without prejudice to your asking for more time in a motion. Thank you very much. Okay. Sure. Sounds good. All right. We'll reserve decision on this case and that concludes our arguments for today. So I'll ask the clerk to adjourn the court. Sure.